Filed 9/11/14  P. v. Harpe CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039590 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F23855) |
| v. | |
| DANIEL BRANDON HARPE, | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

A jury found defendant Daniel Brandon Harpe guilty of possession of a firearm by a felon (count 1; Pen. Code, § 29800, subd. (a)(1)[1]), possession of ammunition by a felon (count 2; § 30305, subd. (a)(1)), receiving a stolen vehicle (count 3; § 496d, subd. (a)), possession of narcotics paraphernalia (count 4; Health & Saf. Code, § 11364.1, subd. (a)), and trespass (count 5; § 602.5, subd. (a)).  Defendant admitted that he had served three prior prison terms.  (§ 667.5, subd. (b).)  The trial court imposed an aggregate prison term of five years.

On appeal, defendant contends:  (1) trial counsel was ineffective for failing to object when the prosecution presented evidence that he and the co-owner of his vehicle had committed prior crimes; (2) the trial court erred by failing to expressly admonish him

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

as to the constitutional rights waived by his admissions to the prior prison term allegations; and (3) the trial court violated section 654 by failing to stay the term for count 2, possession of ammunition by a felon. For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

### A. Prosecution Case

Bernita Drive is a private road in a rural area, with three residential buildings. One residence is owned by Dale Thurston, who lives on site. The other two residences have an absentee owner and are managed by a property manager. One of those residences is 100 Bernita Drive. In late November and early December of 2012, no one was supposed to be living or working at 100 Bernita Drive, which was not in a habitable condition.

In late November of 2012, Thurston saw a white van parked in front of 100 Bernita Drive. He found a man sleeping in the front seat of the van, and he saw that the front door of 100 Bernita Drive was open. The man, who said his name was Jason, told Thurston he was there to do electrical work.

On December 3, 2012, Thurston saw two different vehicles at 100 Bernita Drive: a brand-new gray 2013 Toyota Tundra truck and a light gray Oldsmobile sedan. Thurston knocked on the front door to the house. Defendant answered and said his uncle had sent him there to take care of a tree. When Thurston asked defendant to identify his uncle, defendant did not answer. Defendant walked away and a woman came to the door. Thurston saw a second woman behind her. The first woman, who introduced herself as Lisa, went out to the Oldsmobile. Defendant and the second woman got into the Tundra. Defendant got into the driver's seat and began driving.

On December 5, 2012, Thurston saw the same two vehicles at 100 Bernita Drive. He called the sheriff's department, and three deputies responded. One of the deputies ran

2

the license plate of the Oldsmobile and found it was registered to defendant and Amanda Sloan, as co-owners.

Inside the house, the deputies found defendant and a woman named Genevra Migliore asleep in a bedroom. On the mattress where defendant and Migliore were sleeping, the deputies found a methamphetamine pipe with burnt residue. A second methamphetamine pipe was found in the kitchen. In the toilet, the deputies found an empty baggie that appeared to have been used as drug packaging. In Migliore's purse, the deputies found more drug paraphernalia.

The deputies also found a size extra extra large blue jean jacket inside the house. Inside the jacket, the deputies found a set of car keys, which included a Toyota key. Defendant was six feet two inches tall and wore a size double extra large sweatshirt at the time of his arrest; Migliore was much smaller.

Two deputies searched the Tundra after accessing it with the Toyota key they had found inside the jean jacket. Inside the Tundra, the deputies found a piece of paper covering the vehicle identification number. The deputies later determined that the Tundra had been stolen from Capitol Toyota in San Jose.

Inside the center console of the Tundra, the deputies found a Glock nine-millimeter semiautomatic handgun, which was loaded with a full magazine of ammunition. The gun had been reported as stolen, but the registered owner, Juan Montemayor, claimed "he had never bought a Glock" and "did not know anything about it." A second full magazine of nine-millimeter ammunition was located in a compartment inside the center console.

Also inside the center console of the Tundra, the deputies found a digital camera, which contained a photograph of defendant sitting in the driver's seat of the Tundra along with an unidentified woman. A certificate of ownership for the Oldsmobile was found in the driver's side door panel of the Tundra. A certificate of ownership for another vehicle, with the name Albert Gonzalez, was also found in the Tundra. A new vehicle alarm

3

system was found in the back seat of the Tundra along with a receipt from Best Buy. Video from Best Buy showed an unidentified woman purchasing the alarm system.

The parties stipulated that defendant had been convicted of possessing methamphetamine for sale (Health & Saf. Code, § 11378) in 2011. The parties also stipulated that fingerprints found on items inside the Tundra did not match defendant's fingerprints.

## B.    Defense Case

Erin Miller, defendant's foster sister, testified that she saw defendant frequently, although they had not spoken for several weeks after he "got out of jail." Defendant's style was always the same: he wore jeans or Dickies pants, usually with a t-shirt. She had never observed him wearing a jean jacket.

Trial counsel argued that the circumstantial evidence was insufficient to show defendant possessed the firearm, ammunition, paraphernalia, or truck, and that the circumstantial evidence did not show defendant knew the truck was stolen. Trial counsel argued that there were "so many different people in this case" who could have possessed those items. Trial counsel argued that the police did not fully investigate the case because they knew defendant was a felon with an outstanding warrant.

## C.    Procedural Background

Defendant was charged with possession of a firearm by a felon (count 1; § 29800, subd. (a)(1)), possession of ammunition by a felon (count 2; § 30305, subd. (a)(1)), receiving a stolen vehicle (count 3; § 496d, subd. (a)), possession of narcotics paraphernalia (count 4; Health & Saf. Code, § 11364.1, subd. (a)), and trespass (count 5; § 602.5, subd. (a)). The information alleged that defendant had served three prior prison terms. (§ 667.5, subd. (b).) After a jury trial, defendant was found guilty of all five counts. Defendant then admitted the prior prison term allegations.

At the sentencing hearing, the trial court imposed the two-year midterm for count 1 and concurrent two-year terms for counts 2 and 3. The trial court imposed three

4

consecutive one-year terms for the prior prison term allegations. The court imposed county jail terms for counts 4 and 5.

## III. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Defendant contends trial counsel was ineffective for failing to object when the prosecution presented evidence that he had an "active and longstanding criminal background" and evidence that Sloan had "notoriety" as a criminal.

#### 1. Proceedings Below

Defendant moved, in limine, to exclude evidence of his prior arrests, prior convictions, and prior police contacts, pursuant to Evidence Code sections 1101 and 352. The trial court indicated it did not believe defendant's prior drug-related convictions were admissible, nor his prior conviction for resisting arrest. The court indicated its tentative ruling was "to not allow that," but the court gave the prosecution the opportunity to file additional materials. There is no indication in the record that the prosecution filed any additional materials.

The first mention of prior police contact with defendant or Sloan came during the testimony of Deputy Matthew Presser. Deputy Presser noted that when another deputy ran the license plate of the Oldsmobile, it came back as registered to defendant and Sloan. Referring to Sloan, Deputy Presser stated, "[A]nd at that time she was big talk and there was a lot of stuff that had occurred with her between other agencies in the county, so he asked for extra officers to assist him." Deputy Presser also testified he was familiar with defendant's name. On cross-examination, trial counsel asked Deputy Presser whether he knew that Sloan had been taken into custody two or three days prior to the incident. Deputy Presser said he did know that, and that he was surprised to learn she was no longer in custody.

5

The second mention of prior police contact with defendant or Sloan came during the testimony of Deputy Daren Kerr. The prosecutor asked Deputy Kerr if he was "familiar with" defendant and how long the deputy had known defendant. Deputy Kerr responded, "I think we started doing business together sometime in 2005, maybe a little bit earlier than that." The prosecutor then asked if Deputy Kerr was also "familiar with Amanda Sloan?" Deputy Kerr responded, "I am." Deputy Kerr explained that after the license plate of one of the vehicles "came back" to defendant and Sloan, another deputy had "requested additional units to respond" "based on the names on the registration." Deputy Kerr also stated that at the time, there was "an active parolee at large warrant" for defendant. He further explained, "He's a parolee and failed to comply or committed some type of new offense."

The third mention of prior police contact with defendant or Sloan came during the testimony of Deputy Randall Hop. The prosecution asked Deputy Hop if he was familiar with defendant's name prior to going out to 100 Bernita Drive. Deputy Hop said he had heard defendant's name at a previous briefing with other deputies. Deputy Hop further testified that he recognized Sloan's name and believed she was in custody at the time. He asked dispatch to run a records check on defendant. Dispatch informed Deputy Hop that defendant was on parole and that a warrant had been issued for his arrest. For his safety, Deputy Hop requested that other deputies respond to his location. On cross-examination, trial counsel asked Deputy Hop whether he thought the Oldsmobile "could have evidentiary value" in the case involving Sloan. On redirect, the prosecutor asked if Sloan had been arrested for a shooting. Deputy Hop replied, "Yes," and confirmed he had "participat[ed] in guarding" Sloan after his investigation at 100 Bernita Drive.

### 2. Standard for Ineffective Assistance of Counsel Claims

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct

6

appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).)

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citations.]' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) " ' "[C]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " (*Ibid.*) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel. [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)

"Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*Anderson, supra,* 25 Cal.4th at p. 569; see also *Strickland, supra,* 466 U.S. at p. 694.)

### 3. Analysis

Defendant contends reasonable trial counsel would have objected to the evidence of his and Sloan's prior criminality and that there was "no sound tactical reason for not objecting." He asserts the evidence was not relevant to the charged offenses and "highly prejudicial."

Defendant relies in part on *In re Jones* (1996) 13 Cal.4th 552 (*Jones*), in which the California Supreme Court held that defense counsel was ineffective for failing to object

7

to evidence of the defendant's involvement in two prior criminal incidents. Both prior incidents involved firearms, and the defendant was on trial for a shooting homicide. The first prior incident was "an armed confrontation related to a cocaine transaction." (*Id.* at p. 573.) Although defense counsel articulated a tactical reason for not seeking to exclude that evidence, the California Supreme Court determined that the reason was "a poorly informed one" stemming from an inadequate investigation. (*Id.* at p. 578.) The second prior incident was one in which the defendant had shot his mother-in-law. (*Id*. at p. 578.) Again, the court found that defense counsel had not made a reasonable tactical decision in failing to object and that competent counsel would have recognized the "considerable danger" posed by presenting evidence of a prior shooting. (*Id.* at p. 582.)

The instant case is distinguishable from *Jones*. Here, the jury necessarily had to learn, in conjunction with the felon-in-possession counts, that defendant had prior police contact. The jury learned specifically, by stipulation, that defendant had been convicted of possessing methamphetamine for sale in 2011. In contrast to *Jones,* here there was no evidence that defendant had been involved in any prior violent criminal conduct. The jury knew only that defendant's prior criminality involved narcotics and some kind of parole violation. Thus, the jury here necessarily knew that defendant was a felon. Trial counsel then used that evidence tactically, to suggest that the police did an incomplete investigation because they assumed defendant was guilty due to his prior criminality. This was a reasonable decision in light of the strong evidence connecting defendant to the Tundra, firearm, and ammunition. The evidence that defendant possessed the Tundra and its contents included: defendant was seen driving the Tundra two days earlier, the keys to the Tundra were found in a jacket that was defendant's size, defendant was sleeping at the premises where the Tundra was parked, and a photo of defendant sitting in the driver's seat of the Tundra was found on a camera inside the Tundra. On this record, we cannot say it was "a poorly informed" decision to allow in the evidence of defendant's

8

prior contact with the police or that allowing that evidence to come in posed a "considerable danger" to the defense. (*Jones, supra,* 13 Cal.4th at pp. 578, 582.)

Trial counsel similarly used the evidence of Sloan's prior police contact to try to create reasonable doubt as to whether defendant possessed the firearm, ammunition, and Tundra. Although trial counsel did not mention Sloan by name during argument to the jury, he did cross-examine two of the deputies about Sloan's recent criminal history. He also argued to the jury that the evidence suggested several other people might have possessed the items. The fact that Sloan had a criminal history—which involved a shooting that was still being investigated—lent credence to the notion that she was one of the "many different people" who could have been in possession of the firearm, the ammunition, and/or the Tundra. Thus, trial counsel made a reasonable tactical decision not to object to that evidence.

Defendant notes that trial counsel moved to exclude evidence of defendant's prior criminality during motions in limine. Defendant contends this shows trial counsel did not make a tactical decision not to object. However, trial counsel sought to keep out specific instances of defendant's prior criminal conduct: his "prior convictions, arrests, uncharged 'bad acts', juvenile contacts, or other conduct." No such evidence was ever admitted. The challenged evidence involved general references to defendant having a criminal history, which the jury necessarily had to learn because of the felon-in-possession counts. As explained above, trial counsel's decision to use that evidence to suggest the police did an incomplete investigation was reasonable under the circumstances. Evidence explaining why the police may have failed to investigate other possible perpetrators helped cast some doubt on the otherwise strong evidence connecting defendant to the firearm, ammunition, and Tundra. Trial counsel reasonably determined that jurors might have a reasonable doubt as to defendant's guilt if they thought the police jumped to a conclusion about defendant's involvement rather than performing a more

9

thorough investigation as to other people, such as Sloan, who might have been involved with the Tundra and its contents.

In sum, the record provides a "satisfactory explanation" for counsel's failure to object to the evidence of defendant and Sloan's prior police contacts. (See *Anderson, supra,* 25 Cal.4th at p. 569.) But even if we were to find that trial counsel's decision to use the evidence of defendant and Sloan's prior criminality was not a reasonable one, we would find no prejudice. (See *ibid.*) As noted above, there was very strong evidence that defendant possessed the Tundra and its contents. Defendant was seen driving the Tundra two days earlier, the keys to the Tundra were found in a jacket that was defendant's size, defendant was sleeping at the premises where the Tundra was parked, and a photo of defendant sitting in the driver's seat of the Tundra was found on a camera inside the Tundra. Further, the jury necessarily had to learn that defendant had a prior felony conviction. On this record, even if the jury had not learned that defendant was on parole and was familiar to the police, and even if the jury had not learned that Sloan had a criminal background, there is no reasonable probability that the result of the proceeding would have been different. (See *ibid.*; cf. *People v. Jackson* (1996) 13 Cal.4th 1164, 1214 [no prejudice in admission of reference to defendant's probationary status and evidence of his prior conviction for a nonviolent offense in light of "the considerable evidence against defendant"].)

## B.     *Prior Prison Terms*

Defendant contends the trial court committed *Yurko* error—that is, the trial court erred by failing to expressly admonish him as to the constitutional rights waived by his admissions to the prior prison term allegations. (See *In re Yurko* (1974) 10 Cal.3d 857, 863 (*Yurko*).)

### 1.     Proceedings Below

During motions in limine, the trial court granted defendant's motion to bifurcate trial on the prior prison term allegations. After the jury returned its verdicts, the trial

10

court asked for a sidebar with trial counsel and the prosecutor. The court then noted that there was "one further matter" before the jury could be excused.

After defendant conferred with trial counsel, the trial court stated, "[Defendant], this is a matter where we have granted a bifurcation motion, and you have a right to a jury trial on the second issue presented in this case. [¶] I'm informed by your lawyer that you've decided to give up your right to a jury trial and have a Court trial on the remaining issues. [¶] Is that correct?" Defendant responded, "Yes."

Following this exchange, the jury was excused. The trial court then asked, "Now, are we going to have a court trial on the priors, or are we having an admission?" Trial counsel stated, "There will be an admission, Your Honor," and defendant confirmed that was correct. The trial court then asked defendant, "Do you admit it's true that you have the[] following previous convictions[?]." The court described each conviction, and defendant confirmed each one was true. Defendant also admitted that he served a separate prison sentence for each prior conviction.

### 2. Legal Standards

"[B]efore a court accepts an accused's admission that he [or she] has suffered prior felony convictions," it must provide "express and specific admonitions as to the constitutional rights waived by an admission"—that is, the right to a jury trial, the right of confrontation, and the privilege against self-incrimination. (*Yurko, supra,* 10 Cal.3d at p. 863; see *Boykin v. Alabama* (1969) 395 U.S. 238, 243; *In re Tahl* (1969) 1 Cal.3d 122, 132-133.) When considering a claim of *Yurko* error, "the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of [guilt] was intelligent and voluntary. . . ." (*People v. Mosby* (2004) 33 Cal.4th 353, 361 (*Mosby*).)

### 3. Analysis

Here, the trial court informed defendant that he had a right to a jury trial regarding the prior prison term allegations, but it failed to advise him that he had the right to

11

confrontation or the privilege against self-incrimination with respect to those allegations. This was *Yurko* error. The question we must answer is whether the error was harmless under the standard articulated in *Mosby.*

In *Mosby,* the defendant was advised of his right to a jury trial but was not advised of his rights to remain silent and to confront witnesses against him. (*Mosby, supra,* 33 Cal.4th at pp. 357-358.) On appeal, the defendant contended that the trial court's incomplete advisement of rights rendered his admission of a prior conviction invalid. However, our Supreme Court stated that a defendant's prior experience with the criminal justice system was relevant to whether he or she knowingly waived constitutional rights and pointed out that the defendant had just sat through an entire trial. Applying the totality of circumstances test, the *Mosby* court concluded that the "defendant voluntarily and intelligently admitted his prior conviction despite being advised of and having waived only his right to jury trial." (*Id.* at p. 365, fn. omitted.) " '[H]e knew he did not have to admit [the prior conviction] but could have had a jury or court trial, had just participated in a jury trial where he had confronted witnesses and remained silent, and had experience in pleading guilty in the past, namely, the very conviction that he was now admitting.' " (*Ibid.*)

Defendant contends *Mosby* is distinguishable because here, the trial court told defendant he had a right to a jury trial on "the second issue," rather than specifying that he had a right to a jury trial on the prior prison term allegations. We do not find this fact significant in the context of the case. Defendant moved to bifurcate the prior prison term allegations at the beginning of trial. Those allegations were the only "issue" remaining. Moreover, the record strongly suggests that when defendant conferred with trial counsel, they discussed the decision to waive jury trial on the prior prison term allegations. Under the totality of circumstances test, we conclude that, as in *Mosby,* "defendant voluntarily and intelligently admitted his prior conviction despite being advised of and having waived only his right to jury trial." (*Mosby, supra,* 33 Cal.4th at p. 365, fn. omitted.)

12

Defendant knew he could have had a jury or court trial on the prior prison term allegations, and he had just participated in a jury trial where he had confronted witnesses and remained silent. (See *ibid.*) Although it is not clear defendant had any " 'experience in pleading guilty in the past' " (*ibid.*), he did have a large number of prior felony and misdemeanor convictions, and he had admitted several prior juvenile petitions. "[P]revious experience in the criminal justice system is relevant to a recidivist's ' "knowledge and sophistication regarding his [legal] rights." ' [Citations.]" (*Ibid.,* fn. omitted.)

In sum, although defendant was not expressly advised he would be giving up the right to confrontation and the privilege against self-incrimination, "the record of 'the entire proceeding' " indicates that defendant's admission of guilt was intelligent and voluntary. (*Mosby, supra,* 33 Cal.4th at p. 361.)

### C.     *Section 654*

Defendant contends the trial court violated section 654 by failing to stay the term for count 2, possession of ammunition by a felon.

#### 1.     Proceedings Below

At the sentencing hearing, the trial court expressly found that "possession of a gun and possession of ammunition are separate and distinct things," explaining: "A loaded gun is so much more dangerous than an unloaded gun." The court then imposed separate concurrent terms for count 1 (possession of a firearm by a felon) and count 2 (possession of ammunition by a felon).

#### 2.     Legal Principles

Subdivision (a) of section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." The purpose

13

of the statute is to ensure that the punishment is commensurate with the defendant's culpability. (*People v. Perez* (1979) 23 Cal.3d 545, 550-551 (*Perez*).)

"The proscription against double punishment in section 654 is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute within the meaning of section 654. The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one. [Citations.]" (*People v. Bauer* (1969) 1 Cal.3d 368, 376.) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he [or she] may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*Perez, supra,* 23 Cal.3d at p. 551, fn. omitted.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) On appeal we defer to express or implicit determinations that are based upon substantial evidence. (Cf. *People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

### 3.     Analysis

In *People v. Lopez* (2004) 119 Cal.App.4th 132, the court held that section 654 precluded multiple punishment for possession of a firearm by a felon and possession of ammunition by a felon. In that case, the only ammunition that the defendant possessed was inside the loaded firearm. The *Lopez* court determined that "[t]o allow multiple punishment for possessing ammunition in a firearm would, in our judgment, parse the objectives too finely." (*Id.* at p. 138.) "Where, as here, all of the ammunition is loaded into the firearm, an 'indivisible course of conduct' is present and section 654 precludes

14

multiple punishment." (*Ibid.*) However, the court noted, "there may be instances when multiple punishment is lawful for possession of a firearm and ammunition." (*Ibid.*)

The court in *People v. Sok* (2010) 181 Cal.App.4th 88 (*Sok*) applied similar reasoning in holding that section 654 barred multiple punishment for unlawful gun possession and two counts of unlawful possession of ammunition. The court explained: "[T]he ammunition at issue in those two counts was either loaded into Sok's handgun or had been fired from that gun. There is no evidence in the record that would support the trial court's implied factual finding that Sok had different or multiple objectives in possessing the loaded firearm and possessing the ammunition in the gun itself." (*Id.* at p. 100, fn. omitted.)

In the present case, defendant did not merely possess ammunition inside of the firearm; he possessed ammunition outside of the firearm. Moreover, the amount of ammunition defendant possessed exceeded the capacity of the firearm. Furthermore, a gun and ammunition do not necessarily serve the same purpose, since ammunition can be used to resupply a gun that has been exhausted or given to some other person who might need it. Section 654 does not preclude multiple punishment for a defendant's " 'simultaneous possession of different items of contraband' " when " 'the possession of one item is not essential to the possession of another separate item.' " (*People v. Jones* (2012) 54 Cal.4th 350, 358.)

In sum, the trial court did not violate section 654 by imposing a concurrent term for count 2, possession of ammunition by a felon.

## IV. DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.